The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Thank you. We're prepared to hear argument in November 19, 6871, Gentry v. Robinson. Mr. Shaw, whenever you're ready, sir. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Devion Gentry should not be forced to choose between betraying his religion and rotting in solitary confinement. Now, there are a lot of issues and claims in this case, so I'd like to focus on the following three points. First, Mr. Gentry's equal protection claim should be remanded for development of an appropriate factual record. This claim was dismissed on the pleadings below without the opportunity to engage in discovery. And that dismissal turned on a pure error of law. Second, Mr. Gentry's Arlupa claim is not moot because he appropriately requested broad injunctive relief under this court's precedence, and he still stands to gain from entry of an injunction. Third, Mr. Gentry's First Amendment claim satisfies each of the Turner factors, and thus his forcible intake shaving, as well as his years in solitary confinement in order to practice his religion, violated his constitutional rights. With respect to the equal protection claim. Counsel, actually, I'm so sorry. This is Judge Harris. I am trying to sort of figure out, as you say, there is a lot going on in this case, and I'm trying to figure out how the claims fit together. And so I have a question about your free exercise claim under Turner. The defendants are arguing that at a minimum they would be entitled to qualified immunity on that claim based on case law that approves the grooming policy at the relevant time. And I didn't see you arguing in your reply brief that that was wrong, that there was a clearly established violation here. And I understand you want us to go on and reach the merits anyway, which is something we can do. But you are not arguing, are you, that there is some clearly established law here that would allow for the recovery of damages under this claim? Well, Your Honor, I think there is clearly established law on that fact. And I think Greenhill, which was decided after this case finished briefing, recognized that it was decided based on established jurisprudence. I think the first point to note is that qualified immunity looks for a clearly established law, but it's not necessary to have a case that's directly on point. Existing precedent just has to put the constitutional question beyond debate. The other point I would make is that this court's decisions recognize that the right that is in question in the clearly established law is actually the right, not the right to relief. So, you know, in Walby Wade, I think this court recognized that when it said that, when it recognized that the prisoner had a clearly established right to a diet. Counsel, this is Jed Richardson. Neither you nor your colleague cite our prior decision in Hines v. South Carolina Department of Corrections. But that's a case where we looked at a, you know, got to have short hair, you know, Department of Corrections policy and found it reasonable under the Turner factors, finding all four weighed in favor of the prison. So understanding the other arguments you're trying to make, what I can't understand is how you get around that for qualified immunity. Well, your honor, I think that the question of whether whether there's clearly established law, establishing a right is separate from the more factually focused issue of the Turner factors. I think the right behind behind is a case that literally rejects like what seems to me, at least to be a virtually identical argument. And so it's really hard, you know, which the Supreme Court questioned. But where we have a case that directly addresses, you must keep your hair short argument under the free exercise clause and walks through the analysis and says, no, that claim fails. You got to give some story for that, don't you, to get around qualified immunity. Well, your honor, I. I think that whether a claim fails because suppose that there was no easy and obvious alternative at the time or because, you know, under the facts that were presented by the plaintiffs, there was, you know, not not enough going against the other Turner factors. I think whether that whether a plaintiff prevails on a claim does not define whether the right itself was clearly established. And I believe in the Hines, the court found that there was a substantial burden just that, you know, it was justified by the legitimate theological interests. But the fact is, you know, even under this court's ruling in couch, we gave in 2012 the court found a substantial burden by being forced to shave under the grooming policy that preceded the one at issue here. So I think that the right itself is established. And, you know, if Mr. Gentry's fact has pled, allow him to get over the Turner factors, which is really more of an obstacle to relief rather than establishment of the rights, then I think he would be able to prevail on qualified immunity. Counsel, can I. This is Judge Harris again. I just want to follow up, going back to sort of how your arguments fit together. So just assume for a minute, hypothetically, that there were qualified immunity on the damages claim under the free exercise clause, if that were true. And I understand it's hypothetical and you disagree. But if it were true that there were not going to be damages available under the free exercise claim, does that claim really matter in this case anymore? I mean, if you were, I guess, also assuming hypothetically that you were going. You were correct that your loop of claim is not moot. And so if that claim were going back to the district court, would it really matter one way or another? Whether the free exercise clause were going back, given that the standard is more generous for you under a looper? I guess I'm getting at the thing you get out of your free exercise claim that you don't get out of a loop of damages. But if there aren't damages anyway under the free exercise clause, does it still matter as a practical matter to your case? Well, the practical as a practical matter. Mr. Gentry's relief under the hypothetical that you're proposing would would be provided by a favorable decision on the loop matter. However, I would just point out that, you know, one, there is a there's an interest in progressing the law in realizing these rights. And, you know, there are a number of cases dealing with this policy and previous policies under our looper that, you know, do not apply clearly in the First Amendment context because they were just under our looper. So I think there is a benefit to having a ruling on the merits on the First Amendment claim. And in addition, I think there's just, you know, just as a human. I think Mr. Gentry has an interest in having someone recognize that his rights were violated. So even if you would get the same injunction under our looper, I still think that there would be. And you would also get the same acknowledgment that your rights have been violated. Right. I mean, I absolutely understand what you're saying on behalf of your client and I appreciate it. But at least in the hypothetical, I'm setting up that there will be an acknowledgment that rights were violated. It would just be under a looper and not the free exercise clause. Right. I just, you know, speaking on the human aspect of it again, I think our looper has, you know, our looper. And I think that's the nature is that it's asking, did the defendants affirmatively take enough steps to ensure that they were protecting rights to the maximum degree available? And the First Amendment test, I think, reduces to did they have to do it? And did they do their best? And I think that that's a slightly different question with slightly different implications. But, yeah. Thank you. On the qualified immunity, isn't this overall landscape one where qualified immunity would have a particular applicability? Because there are a few areas of law which are more rapidly evolving than that of the First Amendment religious exercise rights of inmates. And if you look at it, you know, as we are bound to do, what the law was at the time that these various policies were operative, you have a huge number of cases at the time that this policy, with regard to beards and beards at intake, saying that the governing policy, that the grooming policy was perfectly fine. And the policy, it seems to me that qualified immunity is particularly applicable when you are dealing with a constitutional policy that seems to be changing almost every fortnight. And it's very, very hard for people, whether they be in some sort of law enforcement activity or prison governance, it's very hard to keep track of this stuff, really. And they try and they hold classes on it and they hold continuing education studies about how the law is changing and how can we adapt to it. And to take these rapidly shifting tides and say, well, no, we're going to string you up for damages in the middle of all this flux, it seems to me to go against the whole purpose of the qualified immunity in the first place. Well, your honor, I understand that concern. However, I think, you know, in this case, you can fairly point to a few very clear benchmarks establishing that there was a First Amendment right to grow a beard. So much of the law that emphasizes that beards make routine searches slower and that they make them less efficient and that also that some of the having a beard or having an ID at intake, which is the most important thing, I think, to have that shaven ID at intake, because then you have a baseline. Whereas if there's someone bearded at intake, which is a very critical part of the whole process, then you lack that baseline and that basis of comparison. You don't have an idea. If there's a real serious incident and someone was taking it with, you have an individual who committed something with a beard, and he says, no, I didn't do it, then you try to, you could conceivably ask that person to be shaven in the meantime to see if it complied with the purposes of comparison to see who it was that, the purposes of identification. It's just immeasurably helpful to have that initial beardless photograph. Now, what the cases seem to say, and you have Holt v. Hobbs, which is saying that there's a compelling interest, which has implications both for the free exercise claim and also for an equal protection claim. That's pretty strong language to say that you have a compelling interest in some sort of beard identity because of the value that it has for the discovery of, not only for identity, but for the discovery of contraband. It just seems to me the whole situation, together with the case law, really puts prison officials in a very rough place. Even as judges, we have a problem sometimes keeping up with how quickly the content of the law is changing. There's circuit court decisions that come out all the time, there's Supreme Court decisions that come out all the time. We're holding this case in abeyance for that other case and all the rest. Even from the bench, it becomes hard sometimes to keep abreast of everything that's going on, and how much harder must it be for prison officials to do the same thing? That's all I'm saying. Yes, Your Honor. I think that that would be a real concern if Mr. Gentry's case relied on two or three district court cases preceding the events. It would be unmanageable for VDOC to be up to breast on every possible development in the law. I think you identified Hold v. Hobbs, which I think is on point here. As you noted, it recognized a compelling interest in safety and security and identification. But at the same time, it found that that compelling interest was that the policy in question was not the least restrictive means to accomplish it. While the analysis is different under RLUIPA and the First Amendment, I think that... Counsel, this is Judge Rich. I don't want to run out of time, and I have a question on RLUIPA. You stated in your introduction that your client had requested broad injunctive relief. That was part of the point, that it wasn't moot here. When I look at the complaint in paragraph 99, I don't see broad injunctive relief. I want you to help me understand how you get from transfer me or open up a new prison to broad injunctive relief that you claim was requested here. Don't we have to look at what he actually requested and evaluate whether it is either available or whether that relief is moot, not some generic injunctive relief? Yes, Your Honor. We do have to look at the complaints. However, as Williamson and Wall v. Wade recognized, we also have to construe a pro se complaint liberally. First, may I finish answering the question? Yes. We'll give you some extra time. Okay. Thank you, Your Honor. First, I think that liberally construing the complaints, given that Mr. Gentry was in the VHU at the time that he filed the complaint, asking for them to open up an air unit on a lower security level, it incorporates a request to be able to maintain his beard without being in solitary confinement in the VHU. The second point is that paragraph 103 requests any additional relief that this court deems just proper and equitable. In Wall v. Wade and in Williamson, this court recognized that for pro se complaints, that language and actually that specific language can be interpreted to seek all appropriate relief that's available, so long as it's based on the injury that's pled in the complaint. Well, I'm concerned about advisory opinions here, and he's now free to wear his beard in Buckingham. He's not in segregation. He can practice his religion. He's past the intake stage. It seems to me he's got all the relief he seeks. Now, what do you predicate your claim that it's not moot on? Is this the voluntary cessation of unlawful activity or what? That's correct, Your Honor, and to be clear, Mr. Gentry is not seeking injunctive relief relating to his intake shave, and only to the requirement that he live in solitary confinement if he wishes to practice his religion. And the reason that that's not moot is the voluntary cessation doctrine. If you look at defendant's brief, they explicitly say that you shouldn't tie their hands, reduce their discretion, and suggest that entering an injunction protecting Mr. Gentry's constitutional rights would somehow raise some federalism concern. Whether they currently plan to go back to the previous policy or not, they're explicitly signaling that they are able to and want to maintain the ability to. In light of the law now, which you say is clearly established and was even clearly established well before this, what possible reason or incentive would they have to reinstate the grooming policy and to sanction violations of it by sending someone to isolation or the VHU? I mean, is there any realistic chance that these folks are going to go back to an impermissible grooming policy? Because the whole course of their grooming policy has generally been one that's followed a trajectory of loosening restrictions. And I just don't understand why this is likely to recur. What reason do you have to think that they would go back if they would be facing a slew of litigation and everything else? Well, Your Honor, I mean, in Walvey Wade and in Porter v. Clark, the courts did not really investigate the present future intentions of the defendants, but instead noted that they maintained the ability to go back. And in fact, noting that the frequent revisions of the policy suggested more than a mere possibility in Porter v. Clark. But generally, when we are going to grant some kind of futuristic equitable relief, which an injunction is, we know that damages are retrospective and injunctive relief is prospective. And isn't there a federalism component to this, which is that you don't just grant injunctive relief against state officials and state institutional managers just for the heck of it? I guess it was Lyons v. City of Los Angeles or something that is saying, if you're going to grant injunctive relief against state officials, if a federal court is going to grant injunctive relief against state officials, there has to be some realistic or imminent danger that a legal violation is going to occur. And I put myself in the chair of a prison administrator and looking at the law as it is today and the change after five years, within a space of about five years, I would say to the people around me in the room, we'd have to be out of their mind to go back to our former grooming policy. We'd be tied up in litigation all day long. Isn't that realistic in the real world, the fact that there's no restriction now? As long as the beards are hygienic and he can do what he wants, he's free to wear it. I feel sort of silly adjoining something that is not likely to occur. Well, your honor, practically speaking, and I understand this is not responsive to all of your concerns, but practically speaking, if the injunction were entered and VDOC never went back, there would be no harm. I understand the concern about advisory opinions. However, on the ground, that would not harm them if they never wanted to go back. I think my broader concern is the federalism point, as a structural point. But then there's another thing about the voluntary cessation doctrine. Obviously, you can't moot a case just through voluntary cessation of unlawful activities. But you have to ask why that voluntary cessation exception to mootness, why it exists. And what it exists to do is to avoid gamesmanship of somebody who looks like they're going to lose and then voluntarily ceases a policy that the court is about to rule unlawful. And then once the suit is dismissed, it goes back to the former wayward ways. But I don't see that the voluntary cessation, such as it is, or the change, such as it is, is a part of some strategic plan or is a part of some sort of games playing on the part of state officials. It seems to me they were just trying to do their best to keep up with the law. If I thought they were playing games and just sort of acting fairly strategically, then that would be one thing. Do you have any reason to believe that there's something that the voluntary cessation represents some sort of manipulative activity or shenanigans? Is there some reason we should believe that? Well, Your Honor, this court's cases don't require evidence of bad faith on the part of the defendant in order for the voluntary cessation doctrine to apply. While the weight itself found no specific evidence that they were intending to, that it was that pure gamesmanship that you're suggesting. But it did note that that complaint, that the policy change there was issued after the complaint was filed in that case. And that it was in the midst of another separate lawsuit filed by another inmate challenging the same policy. It found the voluntary cessation doctrine applied in that factual situation, which is precisely what happened here with Mr. Gentry in Green Hill. The policy was changed in the midst of litigation challenging it. And there's simply, you know, it's showing that the voluntary cessation doctrine doesn't apply is the defendant's burden. And there just simply isn't a requirement to prove bad faith on the part of the government. Going back to the federalism point I was raising, if you take the view of voluntary cessation that I'm doing here for purposes of argument, doesn't this give the, you want to give state officials an incentive to change their policies. And to move toward more progressive policies in the area of religious exercise. And part of the incentive to move toward a more progressive governance structure in the penal context is they might be free of the possibility of an injunction. You know, they might get that sword off their neck. But if we say, oh, well, voluntary cessation, that doesn't mean anything, and we're going to slam an injunction on you anyway, then that begins to disincentivize state officials from frankly making changes in the exercise of religious exercise that I think we would all want to see occur. We want to make it hospitable for state institutional governance to move in a more respectful direction with respect to rights. And part of, I know just in the real world, part of what incentivizes them is they're not going to get slammed with an injunctive decree, and they make the adjustment. But you see what I'm saying? If you ask us to apply a voluntary cessation exception, aren't you arguing, you might get something in the short run, but in the long run, aren't you arguing against the larger body of prisoners who would want the voluntary cessation? Well, Your Honor, I don't think so. I think that applying voluntary cessation doctrine in this case does not discourage development in the law. You know, you've suggested that there's kind of a one-way transition towards more progressive respect for religious freedoms, and it would be very positive if that were the case. However, applying voluntary cessation here does not punish them for later moving to a better policy. It simply recognizes that they didn't move to the better policy earlier. Holt v. Hobbs was decided in 2015 and essentially recognized the current VDOC policy in rough contours as being at least less restrictive than was in place at the time. You know, it took four years after Holt v. Hobbs for VDOC, four years and several lawsuits challenging the existing policy, for VDOC to change its policy to one that had been sanctioned as less restrictive. I don't necessarily believe that holding VDOC responsible for violating constitutional rights in 2016, despite the fact that they have changed the policy since, encourages them not to change their policy later. Well, I'll be willing to bet you a chocolate milkshake that the VDOC and Buckingham in particular is not about to go back to what they had six years ago. At any rate, you've got some rebuttal time, and I thank you very much for your argument. I really do appreciate it. And I'm going to ask, before we let go of you, I'm going to ask Judge Harris if she has some questions for you. No, that's okay. Thank you. Judge Richardson? I'm good. Thank you. Okay, let's hear from the other side. Good afternoon, Your Honors. May it please the Court, Laura Cahill on behalf of Appalachia. I would like to start my argument where Judge Wilkinson left off regarding the mootness of injunctive relief here. And Judge Wilkinson recognized today the landscape of free exercise rights of inmates. There's very few other areas of law that are expanding as rapidly as they are. And the Department of Corrections grooming policies has gone in that exact same trend. This is not a case where voluntary sedation is appropriate to invoke as an exception to mootness. Counsel, actually, I did struggle with this. I mean, there have been so many changes in the policy in recent years. They're not all in one direction. Unless I misunderstood, in 2019, the intake policy went back to sort of forced compliance without religious exception. So they go both ways. And doesn't the current policy itself sort of call for periodic review? It's not even purporting to be the last word. So I think it is. I agree with you that if we sort of look at the law as a whole, there seems to be something of a trajectory. But that's not exactly the question. I think the question coming out of our cases is whether it is absolutely clear that the policy won't change again. And so I guess I am giving you a chance to address my concern, which is that this has been a bit of a moving target. There have been changes going both ways. The policy we have in front of us does not purport to be the end of the matter. How can we be so sure there's not going to be a change? Yes, Your Honor. First, I respectfully disagree with your assessment of the policies not being a progression. The 2019 policy regarding intake, well, yes, it does allow for use of reasonable force if an offender refuses to comply with the intake procedure in order to obtain that initial photograph. Right. I mean, can I say, please tell me if I'm wrong factually. But I thought that in December 2016, the intake policy allowed for a religious exemption for force shaving. And I'm not trying to talk about the substance of those policies or their legalities, just to make kind of a descriptive point that here is one case where the policy became sort of less generous toward religious objections over time in recent years. Is that not right? I understand what you're saying, Your Honor, but you have to look at it in the entire policy. In the 2016 policy that changed to allow religious exemptions or objections was when they were allowed to then be transferred directly to the VHU in this small housing unit. So there was only 30 offenders, maybe 40 offenders, who maybe wouldn't have the dual ID photograph. With the 2019 policy, we're talking about 25,000 offenders. And so the need for the dual photograph, the clean shaven initial baseline is essential. That is what allows the department to make the change that it did in 2019, expanding the ability to have longer hair and beard at all facilities in DOC. So while if you look at it in a sort of microscopic way, they had it then and they don't have it now, but you have to look at it in the context of what the reasoning behind it is. That change in 2019 allowed for this much more expansive or less restrictive policy. Counsel, can I ask two questions on Wall v. Wade? I had read Wall v. Wade to sort of rightly or wrongly preclude us from doing this, you know, is it likely analysis, but instead to require sort of record evidence that it would not be reinstated. Can you address how after Wall v. Wade we can make the decision that the voluntary cessation doctrine doesn't apply without record evidence? And then the second question I've got, which is maybe related, is whether you agree with your colleague that Wall v. Wade tells us that we should read paragraph 103 of the complaint to encompass a broad demand for injunctive relief as opposed to the much narrower demand that's made in paragraph 99. Yes, Your Honor. First, I'll just touch on that last point. I do not interpret 103 of the complaint to be the same as the situation in Wall. In Wall, there was actually no specific claim for injunctive relief and that was the only claim for injunctive relief, sort of those broad statements. Here, he has very specific requests, so we don't have to look further to construe the intent of the pro se plaintiff. It's very clear. He wrote it. It's different than Wall v. Wade where he only asked for, you know, just proper and equitable relief. So I think it's different. Back to your first question in terms of Wall v. Wade on distinguishing that of whether or not you do an inquiry of likelihood, if I'm rephrasing that correctly, I think there's several different distinctions here. In Wall v. Wade, the change in policy occurred after the filing of the complaint and before the district court had ruled on the dispositive motions. In this case, the department had already obtained a favorable result from the district court in 2019 before changing its complaint. So you don't have that same aspect that you could potentially infer that there's a change in policy in order to attempt to achieve a favorable result. But Wall v. Wade says that defendants have failed to put forth a single piece of evidence, right? Nothing in the record suggests that they're barred or considers itself barred. And I guess what your argument is, that didn't impose a requirement of some record evidence that we should sort of read that part as dicta? No, Your Honor. I would say that, you know, if there is a complete absence of any fact that could be construed as gamesmanship or, you know, directly targeted at the purpose of the voluntary submission doctrine, then doing an inquiry of whether or not defendants had put forward other evidence of that is different. I think in Wall v. Wade, the court had construed several different things to, you know, not reassure them that the department wouldn't change the policy back. Counsel, one thing, we're concentrating a great deal on Wall v. Wade, but there's a preceding case that you can't, one case can't overrule another. And that case is N. Q. Ma, I guess, v. Osment. It's a 2007 Fourth Circuit precedent. And the discussion there in that case is that the voluntary cessation doctrine does not apply, quote, where there's no reasonable expectation that the wrong will be repeated. Now, in the N. Q. Ma case, they look at the reasonable expectation that the wrong will be repeated. And that's a call, but doesn't that precedent have to figure into this whole calculus? Yes, Your Honor, and I believe they can be read together. You know, you always try to harmonize precedents. But I mean, I do think the N. Q. Ma says that it doesn't say that there has to be, it has to be beyond a reasonable doubt and then some, that it will never be, ever be repeated. It talks in terms of reasonable expectations. And I don't understand that Wall v. Wade really contradicts that. And I think they need to be read in pari materia. And I'm wondering if a reasonable expectation standard is one that could come out of a pari materia reading of those two cases. Your Honor, I think that you could absolutely read a reasonable expectation standard to come out of those two, three cases. But I would also argue that in this particular case, we're well beyond that. There is no plausible, as Your Honor stated, there's no possible plausible reason to return to the old policy. So for very many reasons, there is more than just not a somewhat unlikelihood or reasonable unlikelihood to return. I think that there is no likelihood to return to the policy as it would exist in 2016. First of all, there has been a national trend in terms of post-Holtz to now in the field of corrections and in the courts of moving towards less restrictions on grooming policies in corrections. The Department of Corrections here in Virginia now has one of the most progressive policies and has, I would argue, moved in the right direction. So are you authorized to speak for the VDOC in saying that this is just not going to happen? Your Honor, I can represent today on behalf of VDOC that there is no, there will not return to the 2016 policy as it existed. Okay. Well, you know you're making a statement now in open court and Your Honor, I have permission of my client to do so. I thought you might and that, you know, that is important to me because I think there's a commitment there in the statement that you just made. And there's one other point because I thought Judge Harris raised the interesting point when she said that over the past four years, the changes have sort of gone both ways. And it hasn't been just an uninterrupted one direction trajectory. And I wonder what you would say with regard to the question that she raised. About the case going both directions. About the policy going in both directions. Yes, Your Honor, I would argue respectfully, I would disagree with her that I believe that it goes in one single direction. That, well, you know, if you look at one change in isolation, you know, such as the intake policy or what they do on intake, you could say, well, they allowed for a religious exemption before and now they're not. Well, you have to look at that in the greater context because the reason that they have to now require it is because they don't have a secure violators unit where you can house offenders who do not have that dual photograph, do not have that baseline as Your Honor pointed out. And so by expanding, you know, the grooming policy to not restrict all the DOC inmates, 25,000 inmates, the baseline photograph is essential to be able to provide for this greater accommodation or less restrictive accommodation. Thank you, counsel. This is Judge Harris. I understand your answer. Thank you. Can I ask you about the equal protection claim, which it looks like the district court dismissed on the pleading for failure to state the claim. And it looked to me as though the first element that religious objectors were treated differently than non-religious objectors was alleged. And I know your brief focus is on the failure to allege the second element, the discriminatory intent or motive. But given that this is a pro se complaint on page 20 of the joint appendix where it says that. Paragraph 84, David Robinson is fully aware that Muslims and Rastafarians grow hair, but authorize the use of force to I think it's to such inmates or just to cut inmates hair to punish them. That seems like an allegation, pretty clear allegation of discriminatory intent. So what do you want us to do with that claim? It looks to me, at least, as though we need to send that back. But tell me why I'm wrong. Your Honor, to the extent that he is making a facial challenge to the policy, because I'm talking about his challenge of discriminatory enforcement. That it is being applied to religious objectors and in particular to Muslim religious objectors by David Robinson to punish them. I just want to turn to that part. Your Honor, I don't think that there is a name. There is no name of who is involved. There is no allegation that it's done for a bad reason. And I'm looking at the complaint. And again, it's a pro se litigant and you've got your name and you've got the allegation. They're doing it to Muslims to punish them. I don't know what else you would ask a pro se litigant to say. I would agree, Your Honor, if you were reading that particular claim to state a, I guess, as-applied challenge. Dave Robinson, he does allege, excuse me, his official capacity as the person who is responsible for the policy. He did not work at Nottoway. There is no allegation that he told anyone that he authorized the use of force to punish Muslims. I mean, I'm sure you think that this claim will not prove out, but I don't see how we can dismiss it on the pleadings, which is what the district court did. Your Honor, if the court does not agree with my first argument, that I don't believe that he states a claim that there's differential treatment. I mean, did you address paragraph 84 of the complaint? Counsel, did, is this, I mean, I didn't notice that you even addressed this paragraph of the complaint in your brief. Instead, you said there's no allegation of any discriminatory intent. There's no name attached to these allegations, but it's right here. And I just, I'm sort of left a bit adrift on what I should do with your argument on this point. I understand, Your Honor. And in reading these pro se complaints, you know, he brought many other arguments that are not on appeal at this time. And so parsing those out and which facts apply to which could be difficult for the district court. So I thought, I thought the argument here in part was, and maybe I'm, maybe I'm misreading. I thought in part the argument here was that he didn't, he didn't allege that similarly situated people were treated differently. That is non, either non-Muslim or I thought it was sort of more non-religious folks were not treated that way. And is that, is that the argument? Are you not really making that argument? You're really focused on the sort of discriminatory intent piece of the argument? My argument would be twofold, that first of all, the pleading fails under the first element in terms of alleging a discrim, applied, it has actually been applied discriminatorily. He really only alleges that some people had their hair cut at intake. And those people that he knows are religious, but he does not say that the people who did not have to forcibly have their hair cut at intake objected. If you don't object, they're not going to forcibly cut your hair. That is only if someone doesn't voluntarily come into compliance. It looked to me like he was saying that none of the Virgin Islands inmates had their hair cut, but they did forcibly cut the hair just of the people who grew their hair religiously. I, I guess, I guess I'm not sure what I'm missing here. Do we know, I guess, do we know whether the Virgin Island inmates had hair that was out of compliance? I mean, you know, this isn't in the record, but, you know, the Virgin Island inmates are actually part of an interstate compact that are transferred directly from the Virgin Islands to Wallens Ridge at that time per a contract between the Virgin Islands and the Department of Corrections. I would argue that if the court has questions about the pleading standard in this, that the best outcome would be to, you know, sort of remand for further development on the record. We're so focused on qualified immunity in the Fourth Amendment area and the First Amendment area. What, what applicability, if any, does qualified immunity have with respect to the equal protection claim? And does it matter whether the claim is one of facial, whether the challenge is a facial challenge or an as applied challenge? What, what do you, what do you say as to that? Your Honor, it does matter. The equal protection analysis would only really encompass a qualified immunity argument if it was a facial challenge to the policy. And I, I think that the statement that Judge Harris pointed out by Dave Robinson could be construed or the court may have construed as a facial challenge to the policy. Under those circumstances, I believe that absolutely this policy is facially neutral. And even, even if the court were to find otherwise that they would be entitled to qualified immunity. I just, I just really, I want to make sure I understand this. So you think an allegation that they're using forced haircuts to punish Muslims is a facially neutral policy? No, I'm, what am I missing? To the extent that he is arguing in, that counsel argues in his reply brief that it is not facially neutral because of a disparate impact. And I believe that if you read the post-date complainant statements in conjunction that one with other, with the sentences around them, that he, you know, is intending to say that there is a burden on religious offenders. Okay. I actually think we agree on this. I just want to make sure. If I read the complaint as alleging first that they only cut the hair of religious objectors and second, that they do that to punish Muslims. Nobody thinks it's qualified immunity on that kind of a discriminatory enforcement claim, right? You're saying there's qualified immunity if the claim is different, just that overall there is a policy of cutting hair. They do it to everyone and it has a disparate impact on religious observers. There might be qualified immunity as to that claim. But a claim that a policy is being discriminatorily enforced only against religious objectors in order to punish Muslims, that would not get qualified immunity. Correct, Your Honor. Okay. If Your Honor has any other questions about. I'm wondering here, we have the pleading standards of Iqbal Twombly, which requires that a complaint allege a plausible claim and not just something that is within the realm of possibility. Does Iqbal and Twombly require something more here than just a sort of flat conclusion or just something more than saying Muslims have been discriminated against? You don't obviously expect the kind of development of the claim on the pleadings that you would on a summary judgment record. But even in a pro se situation, wouldn't Twombly recall, and Iqbal, wouldn't they suggest that there be some factual material or some development of it beyond a flat conclusion? That gave us some underpinning or reason to believe that there might have been some kind of discrimination afoot. And I guess my problem is awfully threadbare in terms of what is being said. Is this a facial challenge or is it an applied challenge? And if it's one or the other, what is the factual underpinning of it all? Of course you give a certain latitude to a pro se plaintiff, that's only right. But at the same time, it's not unfair to require something more in the way of specificity and factual development in the course of a complaint than was provided here. This one with respect to the equal protection claim seems skimpy. So how do those pleading standards bear upon the issue? Yes, Your Honor, I think that these are what under Iqbal would be considered conclusionary allegations that likely do not fall in the realm of plausibility. I would also like to point, Your Honors, in the direction of the affidavit that was filed. While it wasn't addressed by the court, it is part of this record on JA 71 by Dave Robinson explaining that offenders are treated alike during intake with regard to compliance with the grooming standards irrespective of their religious affiliation. And so that read in conjunction with the policy itself, clearly being facial, I think may, if the court were to look at this from not just a pleading standard, but defeat his claim on a summary judgment standard. OK. Point, counsel, I think we both sides have chewed the bone. I'm going to ask both of my colleagues, each of my colleagues, if they have further questions. Judge Harris, do you have some further questions you would like to ask? No, thank you. Judge Richardson? Sorry, I do not. All right. Thank you very much. And then let's hear from the appellate here on rebuttal.  Thank you, Your Honors. I just have a few points I'd like to clear up. One regarding that statement from Defendant Robinson's affidavit that that speaks specifically to what the policy states and not to what they actually do, given that this is an as applied challenge, you know, describing that the policy does not differentiate between religious and nonreligious individuals, does not do that, that amount of work. Regarding Judge Wilkinson's question about Iqbal, I would just refer the court to Williams v. Hansen at. Sorry, Williams v. Hansen at 584 to 585. You know, it quotes Arlington Heights as noting that in the context of an equal protection claim, in delving in the minds of state officials, the court may look to such circumstantial and direct evidence of intent as may be available. Given that, I think everyone agrees that Mr. Gentry alleged that the policy was applied against religious individuals and not against nonreligious individuals. I think the... But what backup is there for this? Well, Your Honor, there hasn't been discovery. Mr. Gentry wasn't permitted to go to discovery on this claim. This is the point of Iqbal Twombly, that you could just give us something. I mean, I think Judge Harris is correct that you can't have, if you're going through, if you're overtly discriminatory, you can't have qualified immunity on something like that because it's clear you're not supposed to be discriminating against any religious affiliation. But where is it? Let's say, okay, let's say it's an as-applied challenge. An as-applied challenge would require some factual backup under Iqbal Twombly, more so than a purely facial challenge. And where's the backup? Well, Your Honor, among others, I think Judge Harris identified one allegation relating to intent. I'd also point the court to paragraph 12 of the complaint, where he says that they were just trying to humiliate him if they were going to put him in solitary anyway. And he repeats that allegation that they forcibly shaved him at intake just in order to humiliate him several times. Can I go back to the earlier question? What is the site in the complaint that I'm to draw out that there are similarly situated people, in other words, people who had long hair, who were forcibly shaved, or not forcibly shaved, even though they would have been under the policy? What's the best evidence? And I don't mean evidence. I mean, the best allegation that you point to there? Well, Your Honor, I think – I mean, I would note that the district court also recognized the nature of Mr. Gentry's allegations here. He does allege that the Virgin Island inmates who are in the DHU did not have their hair cut during initial intake. He alleges that – And from that, on the Virgin Islands, what you're asking us to do – maybe legitimately, right? I'm not fighting you on it. I just want to make sure I understand. We should infer or liberally construe that allegation to say that they were from the Virgin Islands, and they had long hair, and they were not forcibly shaved. Their hair was not cut. The part of that that's not included is that they fell within the policy and should have had their hair cut. That might be a fair inference from what he's saying, but I'm just trying to understand. That's the argument you're making. Is it implicit in the statement he makes is that the Virgin Island inmates had long hair? That's correct, Your Honor, and I think that's the only way to read that allegation fairly. All right. Judge Harris, I see the bell's rung. Judge Harris, do you have some further questions? No, thank you. Judge Richardson? I don't. Thank you very much. Okay. I want to thank you both for your arguments. We appreciate it very much, and we will take a brief recess, and I'll ask the courtroom deputy to call us back into session as early as practical. The court will take a brief break before hearing the next case.
judges: J. Harvie Wilkinson III, Pamela A. Harris, Julius N. Richardson